EXHIBIT

"A"

1 Sec. Interests in Pers. Prop. § 15:1

Security Interests in Personal Property
Eldon H. Reiley
Database updated September 2004

Chapter 15. Certificate of Title Collateral

§ 15:1. Article 9 and state certificate of title laws

For some types of collateral, a notation on a certificate of title [instead of filing a financing statement] perfects security interests.[FN1] Article 9 incorporates state certificate of title laws and makes them part of its perfection system. In original Article 9 this is done through § 9-302(3) and (4) which provides that if there is an applicable state certificate of title law, filing a financing statement "is not necessary or effective to perfect a security interest," and that compliance with a certificate of title state "is equivalent to the filing of a financing statement," These sections further provide that a security interest in property subject to a certificate of title statute "can be perfected only by compliance therewith ---- ."

These provisions are carried forward into revised Article 9 without substantive change. However, the statement indicating that compliance with state certificate of title laws is the exclusive method of perfection has been clarified to indicate that while collateral is inventory or in possession of the secured party, other methods of perfection may be possible.[FN2] The inventory and possession exceptions are discussed below.

Much Article 9 literature tends to speak of whether Article 9 governs or whether state certificate of title laws govern. Clarity of thought may be gained by merging these concepts. The state title laws are part of the Article 9 perfection system. Article 9 in §§ 9-302, and 9-311(rev), adopts state title laws as the Article 9 method of perfection for those situations to which the title laws apply. Rather than viewing this as two systems of law, view it as two methods of perfection. In matters other than perfection, such as the rights of buyers in ordinary course, Article 9 should apply.[FN3] In this respect, the relationship between Article 9 and state title laws is [or should be] different than the relationship between Article 9 and federal title registration statutes. The federal laws may govern [or preempt] issues broader than mere perfection.[FN4]

[FN1] Notation on the certificate of title generally means formal notation by the appropriate state department. In re Fasick, 234 B.R. 891 (W.D. Mich. 1999) holds that an informal note on the certificate which was not registered with the Bureau of Motor Vehicles does not achieve perfection. Some state statutes provide for informal notation. The South Dakota statute, SD Codifed Laws Ann § 32-3-41, refers to notation "made by the seller, buyer, owner, or holder of the instrument on the reverse thereof ---- ."

[FN2] UCC § 9-311(b)(rev) has been qualified by: "Except as otherwise provided in subsection (d) and Section 9-313 and 9-316(d) and (e) ---- ."

§ 9-311(d)(rev) provides: "During any period in which collateral is inventory held for sale or lease by a person or leased by that person as lessor ---- this section does not apply ---- ."

§§ 9-313(rev) and 9-316(rev) relate to perfection by possession.

[FN3] This result is not always produced by judicial opinions. The question is whether BOCs under Article 9 trump interests noted on the certificate of title. This is discussed in this chapter. Ladd v. Ford Consumer Finance Co., Inc., 217 Mich. App. 119, 550 N.W.2d 826, 30 U.C.C. Rep. Serv. 2d 526 (1996), judgment rev'd on other grounds, 458 Mich. 876, 586 N.W.2d 404 (1998), is an example of a decision that uses state certificate of title laws to redefine the definition of buyer in ordinary course.

[FN4] Federal title registration laws are discussed in Chapter 16.

© West, a Thomson business

GSI § 15:1

END OF DOCUMENT

Copyright (c) 2002 by West Group

GSI § 15:1

EXHIBIT

"B"

U.C.C. Text PEB Commentary No. 6

Uniform Commercial Code
PEB Commentary On The Uniform Commercial Code
Official Text With Comments
The American Law Institute and National Conference of Commissioners on
Uniform State Laws

PEB Commentary No. 6 Section 9-301(1)

## ISSUE

Section 9-301(1) provides (with an exception that is not relevant here) that a security interest is subordinate to members of various specified classes (herein called "the protected classes") who acquired their interests while the security interest was unperfected, subject to conditions set forth for each specified class.

When a security interest is subordinated under this rule in favor of a member of a protected class, does the security interest continue subordinated under the "shelter principle" to an assignee of that protected person, although the assignee does not fit the specific requirements for a member of the protected class because he acquired his interest after the security interest was perfected? In other words, does the protected status of an assignor "shelter" the position of an assignee who by himself would not meet the standards for protection?

## DISCUSSION

A right of ownership of personal property ordinarily consists in part of the right to transfer it to others in the same form and with the same attributes, e.g., freedom from competing ownership interests or defenses or security interests that are not valid against the transferring owner. This right is known as the "shelter principle."

Section 2-403(1) states the shelter principle: "A purchaser of goods acquires all title which his transferor had...." As Official Comment 1 states: "The *basic principle of our law is generally continued and expanded* under subsection (1)." [emphasis added]. Since the principle existed before the Code, it is not dependent on its codification in § 2-403(1). Examples of its use appear in four Articles of the Code:

(a) Sections 3-201(1) and Official Comment 3, 3-305 and Official Comment, and 3-306 and Official Comment 1 illustrate the concept. These provisions set forth the ability of a holder in due course of a negotiable instrument to transfer the instrument free of the defenses and claims which the transferor's status as holder in due course has cut off. It is clear that the transferor's status as holder in due course and the value of his ownership of the instrument would be impaired if he could not transfer the instrument and confer the same status upon his transferee without the transferee qualifying on his own as a holder in due course (when the transfer was a gift or because the instrument had matured or because the transferee had knowledge of a defect). To protect the holder in due course fully, the law must protect the holder's transferee.

(b) Similar shelter provisions are found in connection with equivalent negotiability rules in §§ 8-301(1) and 8-302(4) and Official Comment 5 to the latter.

(c) Similar shelter provisions are found in connection with equivalent negotiability rules in §§ 7-504(1) and 7-502(1).

(d) A similar shelter provision in respect to property rights other than those resting on negotiability is found in Article 9, § 9-313(4)(b). Under specified circumstances this provision gives the holder of a security interest in a fixture priority over the interest of an owner or an incumbrancer of the realty; but this rule is expressly subject to the condition that a real estate interest is not subordinated to the fixture security interest if the real estate interest's predecessor in title was not subject to defeat by the fixture security interest, thus applying the shelter principle. For variation of the shelter principle, see also § 9-313(6), which shelters refinancings of a superior interest from a subordinate interest which would otherwise have priority over the later refinancing.

The case of Aircraft Trading and Services, Inc. v. Braniff, Inc., 819 F.2d 1227, 3 UCC Rep.Serv.2d (Callaghan) 1297 (2d Cir.1987), first called attention to the absence of express shelter provisions in § 9-301(1). Simplifying the facts, A sold an aircraft engine to B and took back a purchase-money mortgage (security interest), which for a time A failed to record as required by federal law. B sold the engine to C, who searched the record and ascertained that there was no recorded mortgage. Thus A's mortgage was subordinate to C's interest, under § 9-301(1)(c), which provides that an unperfected security interest is subordinate to a buyer like C to the extent that he gives value and receives delivery of the collateral without knowledge of the security interest and before it is perfected. Thereafter the mortgage was recorded, thus perfecting the security interest, and still later C sold the engine to D. (D had actual knowledge of the recording, but the Court's opinion did not rest on that fact.)

The Court of Appeals held that since D did not acquire his interest while the security interest was unperfected, D's interest was subject to the security interest. The Court identified the shelter principle with § 2-403(1), then rejected its application in reliance on § 2-402(3), which reads: "Nothing in this Article should be deemed to impair the rights of creditors of the seller (a) under the provisions of the Article on Secured Transactions (Article 9)...." This Commentary does not adhere to that interpretation. Application of the shelter principle of § 2-403(1) in favor of a buyer from one who has obtained senior status under § 9-301(1) does not "impair the rights of creditors." The rights of the unperfected secured creditor have *already* been impaired by the operation of § 9-301(1). The shelter principle should be applied to protect D. Otherwise the value of C's status, as one taking free of the security interest, is unjustifiably impaired if he cannot confer that status upon his transferee. Section 2-402(3)(a) does not compel a different result. Article 2 does not apply the shelter principle, although the principle is stated in § 2-403(1) as an introduction to rules stating when the purchaser can receive *more* than the transferor had.

Once a protected party achieves such senior rights, § 9-301(1) should not be construed to interfere with those rights and the shelter principle should be deemed applicable. The Code is a "complex and interrelated statutory scheme." Bank of Honolulu v. Hawaii Corp., 829 F.2d 813, 815, 4 UCC Rep.Serv.2d (Callaghan) 837, 841 (9th Cir.1987). The Code should be interpreted to produce equivalent results in situations comparable to the four cited above. This broad approach is supported by § 1-102 and its Official Comment 1.

CONCLUSION

Underlying principles of fairness require a broad reading and a broad application of the shelter concept, even when not expressly stated. The importance of shelter is too great in the Code's scheme to support a narrow reading of the Code. Section 9-301(1) should be interpreted and applied in this circumstance to incorporate the shelter principle so that a member of a protected class who prevails thereunder can transfer what he has, even though the security interest which was unperfected when the transferor acquired his rights has since been perfected. The shelter principle also should operate even though the transferee from the protected party has knowledge of the earlier subordinated security interest. The Official Comment to § 9-301 is amended by adding the following:

9. There is no conflict between the principle of § 9-301(1) and the "shelter principle," which is applied at several points in the statute, but is most explicitly stated in § 2-403(1): "A purchaser of goods acquires all title which his transferor had...."

Although § 9-301(1) fails to state the shelter principle expressly, that principle is applicable where a person who had met the conditions for prevailing over an unperfected security interest transfers his right to another person after the security interest is perfected. See PEB Commentary No. 6, dated March 10, 1990.

The rules for subordination of unperfected security interests have a purpose-- in common with similar rules in all filing and recording systems--to impose sanctions for not adhering to filing or recording requirements. Such rules are necessary to make the system effective and enforce the policy against secret liens. The shelter principle recognizes that when a person in a protected class transfers his right after the security interest has been perfected, the right will be diminished in value unless the sanction is continued. The sanction imposed by § 9-301(1) is that members of protected classes take free of an unperfected security interest. That sanction should be continued to protect transferees from those members in order to fulfill the purpose of the section.

Copyright © 2005 By The American Law Institute and National Conference of Commissioners on Uniform State Laws

(2005)

UCC-TEXT PEB NO. 6

END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PEB Commentary No. 6 Section 9-301(1)

EXHIBIT

"C"

U.C.C. General Provisions § 1-103

Uniform Commercial Code
Article 1. General Provisions FNa
Official Text With Comments
The American Law Institute and National Conference of Commissioners on
Uniform State Laws

Part 1. General Provisions

§ 1-103. Construction Of [Uniform Commercial Code] To Promote Its Purposes And
Policies; Applicability Of Supplemental Principles Of Law

(a) [The Uniform Commercial Code] must be liberally construed and applied to
promote its underlying purposes and policies, which are:

(1) to simplify, clarify, and modernize the law governing commercial transactions;

(2) to permit the continued expansion of commercial practices through custom, usage,
and agreement of the parties; and

(3) to make uniform the law among the various jurisdictions.

(b) Unless displaced by the particular provisions of [the Uniform Commercial Code],
the principles of law and equity, including the law merchant and the law relative to
capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress,
coercion, mistake, bankruptcy, and other validating or invalidating cause supplement its
provisions.

Official Comment

**Source:** Former Section 1-102 (1)-(2); Former Section 1-103.

**Changes from former law:** This section is derived from subsections (1) and (2) of
former Section 1-102 and from former Section 1-103. Subsection (a) of this section
combines subsections (1) and (2) of former Section 1-102. Except for changing the form
of reference to the Uniform Commercial Code and minor stylistic changes, its language is
the same as subsections (1) and (2) of former Section 1-102. Except for changing the
form of reference to the Uniform Commercial Code and minor stylistic changes,
subsection (b) of this section is identical to former Section 1-103. The provisions have
been combined in this section to reflect the interrelationship between them.

1. The Uniform Commercial Code is drawn to provide flexibility so that, since it is
intended to be a semi-permanent and infrequently-amended piece of legislation, it will
provide its own machinery for expansion of commercial practices. It is intended to make
it possible for the law embodied in the Uniform Commercial Code to be applied by the
courts in the light of unforeseen and new circumstances and practices. The proper
construction of the Uniform Commercial Code requires, of course, that its interpretation
and application be limited to its reason.

Even prior to the enactment of the Uniform Commercial Code, courts were careful to
keep broad acts from being hampered in their effects by later acts of limited scope. See
*Pacific Wool Growers v. Draper & Co.*, 158 Or. 1, 73 P.2d 1391 (1937), and compare
Section 1-104. The courts have often recognized that the policies embodied in an act are

applicable in reason to subject-matter that was not expressly included in the language of the act, *Commercial Nat. Bank of New Orleans v. Canal-Louisiana Bank & Trust Co.*, 239 U.S. 520, 36 S.Ct. 194, 60 L.Ed. 417 (1916) (bona fide purchase policy of Uniform Warehouse Receipts Act extended to case not covered but of equivalent nature), and did the same where reason and policy so required, even where the subject-matter had been intentionally excluded from the act in general. *Agar v. Orda*, 264 N.Y. 248, 190 N.E. 479 (1934) (Uniform Sales Act change in seller's remedies applied to contract for sale of choses in action even though the general coverage of that Act was intentionally limited to goods "other than things in action.") They implemented a statutory policy with liberal and useful remedies not provided in the statutory text. They disregarded a statutory limitation of remedy where the reason of the limitation did not apply. *Fiterman v. J. N. Johnson & Co.*, 156 Minn. 201, 194 N.W. 399 (1923) (requirement of return of the goods as a condition to rescission for breach of warranty; also, partial rescission allowed). Nothing in the Uniform Commercial Code stands in the way of the continuance of such action by the courts.

The Uniform Commercial Code should be construed in accordance with its underlying purposes and policies. The text of each section should be read in the light of the purpose and policy of the rule or principle in question, as also of the Uniform Commercial Code as a whole, and the application of the language should be construed narrowly or broadly, as the case may be, in conformity with the purposes and policies involved.

2. **Applicability of supplemental principles of law.** Subsection (b) states the basic relationship of the Uniform Commercial Code to supplemental bodies of law. The Uniform Commercial Code was drafted against the backdrop of existing bodies of law, including the common law and equity, and relies on those bodies of law to supplement it provisions in many important ways. At the same time, the Uniform Commercial Code is the primary source of commercial law rules in areas that it governs, and its rules represent choices made by its drafters and the enacting legislatures about the appropriate policies to be furthered in the transactions it covers. Therefore, while principles of common law and equity may *supplement* provisions of the Uniform Commercial Code, they may not be used to *supplant* its provisions, or the purposes and policies those provisions reflect, unless a specific provision of the Uniform Commercial Code provides otherwise. In the absence of such a provision, the Uniform Commercial Code preempts principles of common law and equity that are inconsistent with either its provisions or its purposes and policies.

The language of subsection (b) is intended to reflect both the concept of supplementation and the concept of preemption. Some courts, however, had difficulty in applying the identical language of former Section 1-103 to determine when other law appropriately may be applied to supplement the Uniform Commercial Code, and when that law has been displaced by the Code. Some decisions applied other law in situations in which that application, while not inconsistent with the text of any particular provision of the Uniform Commercial Code, clearly was inconsistent with the underlying purposes and policies reflected in the relevant provisions of the Code. *See, e.g., Sheerbonnet, Ltd. v. American Express Bank, Ltd.*, 951 F. Supp. 403 (S.D.N.Y. 1995). In part, this difficulty arose from Comment 1 to former Section 1-103, which stated that "this section indicates the continued applicability to commercial contracts of all supplemental bodies of law

except insofar as they are explicitly displaced by this Act." The "explicitly displaced" language of that Comment did not accurately reflect the proper scope of Uniform Commercial Code preemption, which extends to displacement of other law that is inconsistent with the purposes and policies of the Uniform Commercial Code, as well as with its text.

3. **Application of subsection (b) to statutes.** The primary focus of Section 1- 103 is on the relationship between the Uniform Commercial Code and principles of common law and equity as developed by the courts. State law, however, increasingly is statutory. Not only are there a growing number of state statutes addressing specific issues that come within the scope of the Uniform Commercial Code, but in some States many general principles of common law and equity have been codified. When the other law relating to a matter within the scope of the Uniform Commercial Code is a statute, the principles of subsection (b) remain relevant to the court's analysis of the relationship between that statute and the Uniform Commercial Code, but other principles of statutory interpretation that specifically address the interrelationship between statutes will be relevant as well. In some situations, the principles of subsection (b) still will be determinative. For example, the mere fact that an equitable principle is stated in statutory form rather than in judicial decisions should not change the court's analysis of whether the principle can be used to supplement the Uniform Commercial Code-under subsection (b), equitable principles may supplement provisions of the Uniform Commercial Code only if they are consistent with the purposes and policies of the Uniform Commercial Code as well as its text. In other situations, however, other interpretive principles addressing the interrelationship between statutes may lead the court to conclude that the other statute is controlling, even though it conflicts with the Uniform Commercial Code. This, for example, would be the result in a situation where the other statute was specifically intended to provide additional protection to a class of individuals engaging in transactions covered by the Uniform Commercial Code.

4. **Listing not exclusive.** The list of sources of supplemental law in subsection (b) is intended to be merely illustrative of the other law that may supplement the Uniform Commercial Code, and is not exclusive. No listing could be exhaustive. Further, the fact that a particular section of the Uniform Commercial Code makes express reference to other law is not intended to suggest the negation of the general application of the principles of subsection (b). Note also that the word "bankruptcy" in subsection (b), continuing the use of that word from former Section 1-103, should be understood not as a specific reference to federal bankruptcy law but, rather as a reference to general principles of insolvency, whether under federal or state law.

FNa [*Revised Article 1 was approved in 2001.*]

Copyright © 2005 By The American Law Institute and National Conference of Commissioners on Uniform State Laws

(2005)

UCC-GP § 1-103

END OF DOCUMENT

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

§ 1-103. Construction Of [Uniform Commercial Code] To Promote Its Purposes And Policies; Applicability Of Supplemental Principles Of Law

EXHIBIT

"D"

1 Sec. Interests in Pers. Prop. § 15:22

Security Interests in Personal Property
Eldon H. Reiley
Database updated September 2004

Chapter 15. Certificate of Title Collateral

§ 15:22. When perfection becomes effective

Under original Article 9 the benefits of a PMSI in equipment or consumer goods are limited to security interest that are perfected "at the time the debtor receives possession of the goods or within ten days thereafter."[FN78] Many state certificate of title offices were unable to process applications within that time. We have noted the proliferation of non-uniform amendments to § 9-312 and the 20-day period permitted by the Bankruptcy Code and revised Article 9.

Another approach to this problem is to find that a security interest is perfected at an earlier point in time than actual notation on the certificate. Some decisions have found perfection under certificate of title statutes when the application and appropriate fees are delivered to the state office. [FN79] Other cases hold that both delivery of documents and notation on the certificate are prerequisites to perfection.[FN80] These results may be colored by whether a buyer or a trustee is challenging the secured party's status and whether the problem is attributable to filing office error as well as the wording of the relevant certificate of title statute.

Revised Article 9 provides that goods "become covered by a certificate of title when a valid application ---- and the applicable fee are delivered to the appropriate authority."[FN81] The comments explain:[FN82]

Goods may become covered by a certificate of title even though no certificate of title has been issued.

Although goods are "covered" by the law of the state to which a title application has been submitted, non-uniform state title law provisions may still set the beginning of perfection at a different time. In some jurisdictions perfection relates back to the time of attachment. In other jurisdictions perfection is not achieved until a certificate of title is issued. Revised Article 9 assumes that perfection should occur upon receipt by the appropriate state office of a completed application.[FN83] Achievement of this result requires concurrence of state title laws. A legislative note is attached to § 9-311(rev) which indicates that state certificate of title statutes that provide for perfection at a different time should be amended. [FN84]

In jurisdictions that follow the mandate of the legislative note, delay by the certificating office should not prejudice a secured party who has submitted the appropriate information and fees. Other types of error may still raise questions. What if the state office fails to note a security interest on the certificate? The California Supreme Court has held that when a Secured Party's interest was not noted due to failure of the state office, the secured party was perfected but was nevertheless defeated by a buyer who was not a BOC. In elevating a non-BOC over a perfected security interest, the

decision ignores § 9-301 and grounds the result on the perceived importance of actual notice provided by a certificate of title system.[FN85]

Errors of filing offices generally are considered in Chapter 11.

[FN78] UCC § 9-312(4).

[FN79] T & O Mobile Homes, Inc. v. United California Bank, 40 Cal. 3d 441, 220 Cal. Rptr. 627, 709 P.2d 430, 42 U.C.C. Rep. Serv. 549 (1985); Liberty Nat'l Bank & Trust Co. v. Garcia, 38 U.C.C. Rep. Serv. 2d 1040, 686 P.2d 303 (Okla. App. 1984). The California court held that even though perfected, the secured party nevertheless lost to a non-BOC buyer on other grounds.

[FN80] In re York, 43 B.R. 36, 39 U.C.C. Rep. Serv. 1863 (Bankr. M.D. Tenn. 1984).

[FN81] UCC § 9-303(a)(rev).

[FN82] Comment No. 3 to UCC § 9-303(rev).

[FN83] For collateral generally, UCC § 9-515(rev). For certificate of title collateral, UCC § 9-303(b)(rev).

[FN84] UCC § 9-311(rev). Legislative Note provides: "This Article contemplates that perfection of a security interest in goods covered by a certificate of title occurs upon receipt by appropriate state officials of a properly tendered application for a certificate of title, without a relation back to an earlier time. States whose certificate of title statutes provide for perfection at a different time or contain a relation-back provision should amend the statutes accordingly."

[FN85] T & O Mobile Homes, Inc. v. United California Bank, 40 Cal. 3d 441, 220 Cal. Rptr. 627, 709 P.2d 430, 42 U.C.C. Rep. Serv. 549 (1985). The opinion suggests that had the certificate borne a statement that it "may not reflect all liens filed with the department against the title and that current title status may be confirmed through the department," a different decision would have been made.

© West, a Thomson business

GSI § 15:22

END OF DOCUMENT

Copyright (c) 2002 by West Group

GSI § 15:22

EXHIBIT

"E"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                                    )
In re Regina Waiters, Debtor,       )
                                    )
                                    )
MARC E. ALBERT, TRUSTEE,            )
                                    )
            Plaintiff/Appellee,     )
                                    )
      v.                            )    Civil Action No. 02-1588 (RWR)
                                    )
NISSAN MOTOR ACCEPTANCE             )
      CORPORATION,                  )
                                    )
            Defendant/Appellant.    )
                                    )
```

## MEMORANDUM OPINION

Appellant Nissan Motor Acceptance Corporation ("Nissan")
appeals a judgment from the United States Bankruptcy Court for
the District of Columbia which granted in part the motion for
summary judgment filed by Appellee Marc E. Albert, the trustee in
the bankruptcy proceedings under Chapter 7 of the Bankruptcy
Code.  In its Decision re Trustee's Motion for Summary Judgment
(May 29, 2002), the bankruptcy court concluded that Nissan's lien
on a 2001 Volvo was avoidable under 11 U.S.C. § 547 (2000), D.C.
Code Ann. § 28:9-311 (2001)[1] and D.C. Code Ann. § 50-1202 (2001),

---

[1]    The bankruptcy court initially cited to D.C. Code Ann.
§ 28:9-310 in its decision, see Bankr. Ct. Decision at 4
("[U]ntil that certificate [of title] is issued, perfection must
be made in accordance with the UCC, specifically D.C. Code Ann.
§ 28:9-310, by filing a financing statement."), but later made

- 2 -

and entered judgment consistent with its decision on June 28,
2002.  This court has jurisdiction over Nissan's appeal pursuant
to 28 U.S.C. § 158 (2000).  In its appeal, Nissan argues that a
lien obtained from the District of Columbia Department of Motor
Vehicles ("DC DMV") more than twenty (20) days from the date of
the 2001 Volvo's purchase should nevertheless have been
considered perfected within the that statutory time period
required under 11 U.S.C. § 547(c)(3)(B), therefore entitling
Nissan to prevent the Trustee's avoidance of the lien.[2]  Although
the 2001 Volvo became covered by a certificate of title on
July 9, 2001, but that certificate of title remained outstanding
and non-perfected under District of Columbia law until August 6,
2001, the bankruptcy court's June 28, 2002 Judgment will be
affirmed.

---

clear that it meant to rely on D.C. Code Ann. § 28:9-311.  See
id. at 6 n. 4 ("The court has been unable to find any provision
of the Virginia Code which, like D.C. Code Ann. § 50-1202, when
read together with D.C. Code [Ann.] § 28:9-311, addresses
perfection of a security interest in a motor vehicle prior to
issuance of an original certificate of title . . ..").

[2]     Nissan does not appeal all aspects of the bankruptcy
court's June 28, 2002 Judgment, but instead challenges the
judgment only as it pertains to Section II of the Decision re
Trustee's Motion for Summary Judgment which addressed the
perfection of a security interest in the 2001 Volvo.  The other
decisions encompassed by the bankruptcy court's judgment are not
therefore before this court for review and are not addressed by
this Memorandum Opinion.

- 3 -

## BACKGROUND

On June 24, 2001, Regina Waiters financed through Nissan a purchase of a 2001 Volvo from a car dealership, Passport Nissan (the "dealer"). See Appellant's Br. at 2 and Ex. A; Appellee's Br. at 2; Bankr. Ct. Decision at 2. On July 9, 2001, fifteen (15) days after the purchase of the vehicle, the dealer submitted to the DC DMV an application for a certificate of title, which the DC DMV initially rejected.[3] See Appellant's Br. at 2-3; Appellee's Br. at 3; Bankr. Ct. Decision at 2. The dealer did not also file a financing statement regarding the security interest in the Volvo. See Bankr. Ct. Decision at 2. On July 16, 2001, twenty-two days after she purchased the 2001 Volvo, Waiters filed a voluntary bankruptcy petition. See id.; Appellee's Br. at 2. The dealer assigned its security interest in the Volvo to Nissan on July 24, 2001, thirty days after Waiters' purchase. See Bankr. Ct. Decision at 2. On August 6, 2001, forty-three days after the date that Waiters took possession of the car, the DC DMV issued a certificate of title for the 2001 Volvo which for the first time noted on the

_____

[3]     Nissan asserts that "[b]oth the Bankruptcy Court and the Trustee assumed for purposes of the [Trustee's] Motion for Summary Judgment that the DMV's rejection of the Dealer's Application was improper . . .." Appellant's Br. at 3.  The Trustee does not dispute this assertion in its appellate brief.

- 4 -

certificate Nissan's lien. See id. at 2-3; Appellant's Br. at
Ex. B. The DC DMV backdated the certificate of title to have a
title date of July 24, 2001. See Bankr. Ct. Decision at 3;
Appellant's Br. at 3 and Ex. B.

In November 2001, the Trustee filed suit to avoid Nissan's
lien. The bankruptcy court ruled that the dealer did not perfect
the security interest in the Volvo within the 20-day time period
set forth in § 547(c)(3)(B), thereby precluding Nissan from
availing itself of the protections afforded by that section. See
Bankr. Ct. Decision at 4. The bankruptcy court therefore
concluded that the Trustee could avoid Nissan's lien in the
Volvo.

## STANDARD OF REVIEW

The district court reviews a bankruptcy court's legal
conclusions de novo and upholds the bankruptcy court's factual
determinations unless the appellant shows that they are clearly
erroneous. See In re WPG, Inc., 282 B.R. 66, 68 (D.D.C. 2002).
The party seeking to reverse a bankruptcy court's ruling bears
the burden of proof, and that party must demonstrate that the
bankruptcy court's decision was clearly erroneous as to the
assessment of the facts or erroneous in its interpretation of the
law, and not just that a different conclusion could have been
reached. See In re Ford Johnson, 236 B.R. 510, 518 (D.D.C.

1999). "On appeal from a bankruptcy court, a district court may affirm, modify, or reverse a bankruptcy court's judgment, or remand with instructions for further proceedings." In re WPG, Inc., 282 B.R. at 68.

## DISCUSSION

Section 547(c) of the Bankruptcy Code, Title 11, states, in relevant part, that "[t]he trustee may not avoid under this section a transfer . . . that creates a security interest in property acquired by the debtor . . . that is perfected on or before 20 days after the debtor receives possession of the property." 11 U.S.C. § 547(c)(3)(B). Further, § 547(e) states, in pertinent part, that "[f]or the purposes of this section -- a transfer of a fixture or property other than real property is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee." Id. § 547(e)(1)(B).

In this case, it is undisputed that Waiters received possession of the 2001 Volvo on June 24, 2001. Thus, in order for § 547(c)(3)(B) to provide Nissan with any protection from the Trustee's suit to avoid the lien, Nissan must demonstrate that

- 6 -

the dealer[4] perfected the security interest in the Volvo by
July 14, 2001.

Nissan therefore relies on <u>Fidelity Financial Services, Inc.</u>
<u>v. Fink</u>, 522 U.S. 211 (1998), in support of its argument that the
dealer perfected the security interest in the Volvo on July 9,
2001, within the 20 day period. <u>See</u> Appellant's Br. at 5-11.
However, the Trustee also relies on <u>Fink</u> in support of its
position that the dealer and Nissan failed to perfect the lien
under District of Columbia law within the 20 day period. <u>See</u>
Appellee's Br. at 8-10.

In <u>Fink</u>, a Chapter 13 debtor gave Fidelity Financial
Services a promissory note in relation to her purchase of a
1994 Ford.  Twenty-one days later, Fidelity mailed an application
to the Missouri Department of Revenue to perfect its security
interest in the Ford.  The Supreme Court rejected Fidelity's
argument that the trustee could not avoid its lien in the
1994 Ford and held that "a creditor may invoke the enabling loan
exception of § 547(c)(3) only by acting to perfect its security
interest within 20 days after the debtor takes possession of its

---

[4]     Because the dealer did not assign its security interest
in the Volvo to Nissan until July 24, 2001 -- thirty days after
Waiter took possession of the Volvo -- it would have been
incumbent upon the dealer to perfect the security interest in the
Volvo within the 20 day period set forth in § 547(c)(3)(B).

- 7 -

property." Fink, 522 U.S. at 221. In so holding, the Supreme

Court recognized that

> Not until the secured party actually performs the final act
> that will perfect its interest can other creditors be
> foreclosed conclusively from obtaining a superior lien. It
> is only then that they "cannot" acquire such a lien. Thus,
> the terms of § 547(e)(1)(B) apparently imply that a transfer
> is "perfected" only when the secured party has done all the
> acts required to perfect its interest . . ..

Id. at 216. Moreover, the Supreme Court noted that whether or

not a security interest is perfected within the 20 day period

required by § 547(c)(3)(B) will turn on the vagaries of state

law:

> Whether the mailing [of the application by Fidelity] was
> sufficient to perfect the interest [in the 1994 Ford] is an
> issue of state law not raised by this case. In speaking
> below of acts necessary to perfect a security interest under
> state law, we mean whatever acts must be done to effect
> perfection under the terms of the applicable state statute,
> whether those be acts of a creditor or acts of a
> governmental employee delivering or responding to a
> creditor's application . . ..

Id. at 213 n. 1. Under Finks, then, whether the dealer perfected

Nissan's security interest in the 2001 Volvo before July 14, 2001

turns on District of Columbia law.

Nissan argues that D.C. Code Ann. § 28:9-303 (2001)

"conclusively demonstrates that the Dealer did all that it was

required to do in order to perfect its security interest in

Ms. Waiter's Volvo, and serves to confirm that the District of

Columbia adheres to the United States Supreme Court's

- 8 -

pronouncement in <u>Fink</u> as to the manner in which a lien creditor complies with the enabling loan exception of § 547(c)(3)." Nissan is only partially correct. Section 28:9-303 provides, in part, that "[g]oods become covered by a certificate of title when a valid application for the certificate of title and the applicable fee are delivered to the appropriate authority." D.C. Code Ann. § 28:9-303(b). Yet, § 28:9-303 also provides that "[t]he local law of the jurisdiction under whose certificate of title the goods are covered governs perfection, [and] the effect of perfection or nonperfection . . .." <u>Id.</u> § 28:9-303(c). In other words, although it is true that the 2001 Volvo became covered by a certificate of title on July 9, 2001 when the dealer submitted to the DC DMV an application for a certificate of title, whether and when that certificate became perfected depends upon the interplay between § 28:9-303 of the D.C. Code and other provisions of the D.C. Code which govern liens on motor vehicles.

Under § 50-1202, D.C. Code Ann., of the motor vehicle laws for the District of Columbia, a certificate of title for a car remains outstanding unless and until the lien appears on the certificate:

> During the time a certificate is outstanding for any motor vehicle . . ., no lien against such motor vehicle . . . shall be valid except as between the parties and as to any other persons having actual notice, unless and until entered on such certificate as hereinafter set forth . . . .

- 9 -

D.C. Code Ann. § 50-1202; see In re Johnson, 230 B.R. 466, 469

(Bankr. D.D.C. 1999) (quoting same[5] and stating that "District of

Columbia law provides that a security interest in a car is

perfected by entering a lien on the certificate title[.]").

Section 50-1202 also provides that

> [t]he filing provisions of Article 9 of Subtitle I of Title
> 28 of the District of Columbia Official Code do not apply to
> liens recorded as herein provided, and a lien has no greater
> validity or effect during the time a certificate is
> outstanding for the motor vehicle or trailer covered thereby
> by reason of the fact that the lien has been filed in
> accordance with that article.

D.C. Code Ann. § 50-1202. Thus, § 50-1202 clearly contemplates

that a certificate of title covering a car can and does remain

outstanding and nonperfected until such time that the Recorder of

Deeds of the District of Columbia enters the lien on the

certificate,[6] and such a certificate has no greater validity or

effect while the certificate is outstanding by reason of filing a

financing statement.  An outstanding certificate is therefore

---

[5]    The bankruptcy court in In re Johnson quoted language
from D.C. Code Ann. § 40-1002, which has since been recodified
without change at § 50-1202.

[6]    Indeed, several provisions of the District of Columbia
motor vehicle laws governing liens on cars task the Recorder
with, among other things, entering liens on certificates for
determining the priority of liens, see D.C. Code Ann. § 50-1203,
issuing certificates of title, see id. §§ 50-1206, 50-1207, and
recording on certificates the assignments of unsatisfied liens.
See id. § 50-1208.

- 10 -

neither perfected nor valid against a lien creditor[7] who does not
have actual notice of the outstanding certificate.

Here, the Recorder did not enter the lien on the certificate
of title for the 2001 Volvo until August 6, 2001, see Bankr. Ct.
Decision at 2-3, and then backdated the title date to July 24,
2001, see id.; Appellant's Br., Ex. B, which was still more than
20 days after Waiters purchased the car. Under District of
Columbia law, the certificate of title covering the Volvo
remained outstanding and non-perfected until August 6, 2001, see
D.C. Code. Ann. § 50-1202, and it is undisputed that the Trustee
became a lien creditor in the Volvo on July 16, 2001, when
Waiters filed for Chapter 7 bankruptcy. Nissan cannot therefore
avail itself of the § 547(c)(3)(B) exemption because the Trustee
could -- and did -- acquire on July 16, 2001 a judicial lien that
is superior to the interest of Nissan. See 11 U.S.C.
§ 547(e)(1)(B). Accordingly, to the extent the bankruptcy
court's June 28, 2002 Judgment is based on the conclusion that

---

[7]    Under D.C. Code Ann. § 28:9-102(52)(c), a lien creditor
is defined to include "[a] trustee in bankruptcy from the date of
the filing of the petition . . .."

- 11 -

the dealer did not perfect a security interest in the 2001 Volvo
by July 14, 2001, that Judgment will be affirmed.[8]

## CONCLUSION

_____The 2001 Volvo purchased by Waiters became covered by a
certificate of title on July 9, 2001, but that certificate
remained outstanding and non-perfected under District of Columbia
law until August 6, 2001.  Because Nissan cannot invoke the

---

[8]      Despite correctly concluding that the dealer had not
perfected the security interest in the 2001 Volvo before July 14,
2001, the bankruptcy court went on to discuss in dicta whether
the dealer or Nissan could have nevertheless perfected a security
interest in the Volvo such that Nissan's rights would have been
superior to those of other creditors even during the interim
period in which the certificate of title remained outstanding.
See Bankr. Ct. Decision at 4-7.  The bankruptcy court determined
that under D.C. Code Ann. § 28:9-311 -- as read in conjunction
with D.C. Code § 50-1202 -- the dealer and/or Nissan could have
perfected a security interest in the interim period between
July 9, 2001 and August 6, 2001 by filing a financing statement.
See id. at 6-7 & n.4.

In correctly recognizing that there may be instances where
certificates of title, although submitted to the DC-DMV, remain
outstanding and non-perfected under District of Columbia law, see
D.C. Code Ann. § 50-1202, the bankruptcy court appeared to
recognize, albeit in dictum, some modicum of protection for car
dealers (and by extension transferee parties such as Nissan)
during that interim period through D.C. Code Ann. § 28:9-311.  It
seems, though, that a financing statement filed under § 28:9-311
would be of no effect under District of Columbia law.  Section
28:9-311 provides, in pertinent part, that "the filing of a
financing statement is not necessary or effective to perfect a
security interest in property subject to . . . [t]he provisions
of section 50-1201, et seq."  D.C. Code Ann. § 28:9-311(a)(2).
Sections 50-1201 to 50-1217 set forth District of Columbia laws
regarding Liens on Motor Vehicles or Trailers, such as the 2001
Volvo purchased by Waiters and financed through Nissan.

- 12 -

protection afforded by 11 U.S.C. § 547(c)(3)(B), the bankruptcy court's June 28, 2002 Judgment will be affirmed.

A separate Order accompanies this Memorandum Opinion.

SIGNED this 12th day of July, 2004.

RICHARD W. ROBERTS
United States District Judge